Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
KAHN SWICK & FOTI, LLP
505 Montgomery Street, 10th Floor
San Francisco, California 94111
Telephone: (415) 874-3047
Facsimile: (504) 455-1498

Lewis S. Kahn (to seek *pro hac vice* admission)
lewis.kahn@ksfcounsel.com
Melinda A. Nicholson (to seek *pro hac vice* admission)
melinda.nicholson@ksfcounsel.com
Michael J. Palestina (to seek *pro hac vice* admission)
michael.palestina@ksfcounsel.com
KAHN SWICK & FOTI, LLC
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Counsel for Plaintiff Nipu Shah*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NIPU SHAH, On Behalf of Herself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> ROCKET FUEL INC., GEORGE H. JOHN, J. PETER BARDWICK, CREDIT SUISSE SECURITIES (USA) LLC AND CITIGROUP GLOBAL MARKETS INC. <br><br> Defendants. | Docket No.: _____ <br><br> **CLASS ACTION** <br><br> COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

*"The buyers [like Rocket Fuel] are willing to*
*be defrauded because it looks good on paper*."
Vivek Shah – Chairman, Interactive Advertising Bureau[1]
February 2014

Nipu Shah ("Plaintiff"), by and through her counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon counsel's investigation, which includes review and analysis of, *inter alia*: (a) regulatory filings made by Rocket Fuel Inc. ("Rocket Fuel" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued and disseminated by the Company; (c) analyst and media reports concerning Rocket Fuel; and (d) other information regarding the Company.

## INTRODUCTION

1.      This is a putative class action for violations of the federal securities laws. Plaintiff brings this on behalf of purchasers of Rocket Fuel's common stock between September 20, 2013 and August 5, 2014, inclusive (the "Class Period"), who were damaged by the conduct asserted herein (the "Class").   Plaintiff asserts claims against Rocket Fuel and the Insider Defendants (as defined in ¶¶17-19 *infra*) for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Plaintiff's Exchange Act claims arise out of a fraudulent course of business conduct.

2.      Separately, Plaintiff asserts claims pursuant to §§ 11(a), 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") for materially untrue statements and omissions in the Registration Statement on Form S-1/A that Rocket Fuel filed with the SEC on or about September 18, 2013, and the Prospectuses on Form 424(b)(5) that Rocket Fuel filed with the SEC on or about September 20, 2013.  The Securities Act claims are not based on any allegation of deliberate or intentional misconduct and Plaintiff specifically disclaims any reference to or

---

[1]      The Interactive Advertising Bureau ("IAB") is comprised of more than 600 leading media and technology companies that are responsible for selling 86% of online advertising in the United States.

reliance upon fraud allegations for such claims. The defendants for the Securities Act claims are Rocket Fuel, the Insider Defendants, and the lead underwriters for the Company's September 20, 2013 initial public offering ("IPO").

3.      Throughout the Class Period, each of the Defendants either recklessly or negligently disregarded that: (i) the statements and omissions alleged below were false and misleading; (ii) such statements would adversely affect the integrity of the market for Rocket Fuel securities; and (iii) such statements would deceive investors into purchasing Rocket Fuel securities at artificially inflated prices, including at prices as high as $61.00 per share in the Company's Secondary Offering that the Company announced in a press release on Form 8-K on or about January 22, 2013.

## NATURE OF THE ACTION

4.      Rocket Fuel provides a programmatic media-buying platform to purportedly improve marketing return on investment in digital media across web, mobile, video, and social channels. The Company purports to provide advertising solutions that transform digital media buys into self-optimizing engines to exceed advertising goals from awareness to sales. The Company's artificial intelligence ("AI") system autonomously buys ad spots, or impressions, one at a time, on advertising exchanges to create portfolios of impressions designed to optimize the goals of its advertisers, such as increased sales, heightened brand awareness and decreased cost per customer acquisition.[2] In simpler terms, Rocket Fuel engages in programmatic buying at high frequency and at massive scale to enable its customers to maximize advertising opportunities on the internet.

5.      Advertisers expect that online content is viewed by human audiences who have the potential to buy a product or service. The interactive advertising industry, however, is plagued by robotic traffic ("bot traffic" or "fraudulent traffic") which bad actors use to profit

---

[2]      An impression in the context of online advertising is a measure of the number of times an ad is seen. Cost-per-impression is the cost or expense incurred for marketing potential customers who view the advertisement(s).

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

from fake, nonhuman traffic.  Bot traffic is driven by code, not humans, so it lacks the ability to generate real conversions or purchases.  In other words, bots don't buy and wear Levi's.  At their most sophisticated, bots can mimic the behavior of online consumers, clicking from one site to the next, pausing at ads, watching videos, and even putting items in online shopping carts.  The activity generated by bots dilutes the value and quality of legitimate publisher ad inventory, otherwise known as inventory quality.  Ad fraud is predicted to cost marketers as much as $11 billion in 2014, a 22% increase over 2013.

6.   An August 22, 2014 blog post by the law firm of McDermott Will & Emory on the *National Law Review* cited a study finding that "an estimated 36 percent of all web traffic is bot generated."  Advertising consultancy Medialink estimates that as much as 25% of online ad revenue is wasted on fraud, and piracy audience-research firm comScore found that 36% of online ad impressions, or views, are generated by nonhumans.  A *Wall Street Journal* article in March 2014 called "A 'Crisis' in Online Ads: One-Third of Traffic Is Bogus" reported how, while "[b]illions of dollars are flowing into online advertising … marketers also are confronting an uncomfortable reality: rampant fraud . . . . Vivek Shah, the chairman of the Interactive Advertising Bureau, said at the group's annual conference last month [February 2014] that Internet advertising was facing a 'crisis.'"

7.   As alleged herein, the Exchange Act Defendants either knew or were reckless in not knowing about the Company's inability to eliminate ad fraud and bot traffic in Rocket Fuel's advertising campaigns, while nevertheless assuring investors and others that their proprietary technology could "identify and eliminate all" such threats.  Prior to the Class Period, for instance, defendants represented that Rocket Fuel's proprietary AI and big data technology gave it a ***competitive advantage*** that delivered superior results for its customers, including the ability to "block bad sites and pages before we ever serve a ***single ad*** on them."

8.   Similarly, during the Class Period, the Company represented that it had the ability to "undermine fraudulent practices and make sure con artists ***always*** leave empty handed. Using the same powerful technology that optimizes our clients' campaigns, Rocket Fuel is able to

identify and eliminate **all** threats before serving a single ad."[3]  As alleged below, these and similar representations were materially misleading at the time of publication.

9.      Moreover, defendants also failed to adequately disclose the threats posed by fraudulent traffic in Rocket Fuel's filings with the SEC in a manner that would have warned investors that the Company's current and future financial performance was in jeopardy. Ultimately, at various times during the Class Period, defendants either (i) overstated their ability to combat ad fraud; or (ii) understated the gravity of the problem by, for instance, describing a May 2014 *Financial Times* article about Rocket's Fuel's fraud traffic exposure (*see* ¶83, *infra*) as "sensational headlines on top of non-news."  As a partial result of defendants' misrepresentations, the price of the Company's common stock opened for trading on September 20, 2013 at nearly $60.00 per share – or more than double the Company's IPO price of $29.00 per share – and reached a trading high of $71.89 during the Class Period.

10.      The artificial boost in Rocket Fuel's share price was, however, short-lived.  On August 5, 2014, Rocket Fuel drastically lowered its full-year 2014 revenue guidance primarily due to what it admitted was customer concern about **inventory quality** resulting from the Company's inability to identify and eliminate fraudulent ad traffic.  On a same-day conference call, defendant John represented that, somehow suddenly, "[a]cross all channels, we've seen increased advertiser and agency interest in the quality of ad space and audiences they buy with increased concerns around bot traffic and viewability."

11.      In truth, as the *Wall Street Journal* reported on August 12, 2014, the "online ad industry has been well **aware of its fraud problem for years** . . . ."  Following the Company's poor August 5, 2013 announcement, the Company's shares fell approximately 30% from $24.75 to $17.05 on August 6, 2014 in a single day on unusually high trading volume of over six million shares traded, damaging investors.

---

[3]      All emphasis added unless otherwise noted.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

12.     Before Rocket Fuel's negative August 5, 2014 disclosures, however, the Company's highest-ranking insiders and early investors had cashed out in the Secondary Offering in February 2014 to the tune of ***$175 million***.  Their timing was, to say the least, exquisite.  Plaintiff and the Class have not been as fortunate.  At present, Rocket Fuel's shares currently languishes at approximately $16.00 per share, while the Company's year-to-date performance is down approximately 75%.

## PARTIES

### Plaintiff

13.     Plaintiff Nipu Shah purchased Rocket Fuel common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

### Company Defendants

14.     Defendant Rocket Fuel describes itself as a leading provider of artificial intelligence advertising solutions that transform digital media buys into self-optimizing engines that learn and adapt in real time to exceed advertising goals from awareness to sales.  The Company purports to deliver a leading programmatic media-buying platform at Big Data scale. It has customers in North America, Europe, and Japan that have used Rocket Fuel to run digital advertising campaigns globally.

15.     The Company's Corporate Headquarters are located at 1900 Seaport Blvd., Redwood City, CA 94063.  On September 20, 2013, the Company filed a Prospectus pursuant to Rule 424(b)(4) with the SEC for an initial public offering of the common stock of Rocket Fuel to sell 4,000,000 shares of common stock.  The initial public offering price was $29.00 per share.

16.     Rocket Fuel's shares began trading on the NASDAQ Global Select Market under the symbol "FUEL" on September 20, 2013.

17.     At all relevant times, Defendant George John was the Company's Chief Executive Officer ("CEO").  He is a co-founder of Rocket Fuel and signed the IPO Offering Materials and Annual Reports on Form 10-K that Rocket Fuel filed with the SEC.

18.     At all relevant times, Defendant J. Peter Bardwick was the Company's Chief Financial Officer ("CFO").  In September 2013, Bardwick managed Rocket Fuel's IPO, and in January 2014, managed the Company's Secondary Offering.  In addition, Defendant Bardwick signed the Company's Class Period press releases on Form 8-K and Quarterly Reports on Form 10-Q with the SEC.  Bardwick also signed the IPO Offering Materials.

19.     Defendants John and Bardwick are collectively referred to herein as the "Insider Defendants."

20.     Because of the Insider Defendants' positions within the Company, they each had access to the adverse undisclosed information about Rocket Fuel's business, operations, and practices through access to internal corporate documents, conversations, and contact with other corporate officers and employees, attendance at meetings, and through reports and other information provided to them.

21.     Each of the Insider Defendants, by virtue of their high-level position, was directly involved in the day-to-day operations of Rocket Fuel at the highest levels and was privy to confidential information concerning the Company, its business, operations, and practices, including the misstatements alleged herein.  This included the Company's weekly Thursday meetings to discuss the Company's operations and performance, including the Company's inventory quality.  Rocket Fuel co-founder and President Richard Frankel participated in these calls.

22.     Their positions of control and authority as officers or directors enabled the Insider Defendants to control the contents of SEC filings, press releases, presentations to securities analysts, and other public statements made to Rocket Fuel shareholders during the Class Period.  Accordingly, each of the Insider Defendants bears responsibility for the accuracy of the public reports and press releases detailed herein, and is therefore primarily liable for the misrepresentations and omissions contained therein.

23.     During the Class Period, each of the Insider Defendants substantially participated and had exclusive authority and control over the content of Rocket Fuel's false and misleading

statements and how they were communicated to investors.  Defendants also engaged in conduct in furtherance of a fraudulent scheme and course of business and were involved in the preparation and dissemination of Rocket Fuel's misleading statements, all of which made it necessary or inevitable that material misrepresentations and the false results of Defendants' scheme would be communicated to, and mislead, investors.

24.    The Insider Defendants were obliged to refrain from falsifying Rocket Fuel's books and were prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of Rocket Fuel's securities.

25.    Each of the Insider Defendants is liable as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchases of Rocket Fuel securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Rocket Fuel's operations.  Defendants' scheme deceived the investing public regarding Rocket Fuel's operations and the intrinsic value of Rocket Fuel's securities, and caused Plaintiff and other members of the Class to be damaged as a result of their purchases of Rocket Fuel securities at artificially inflated prices.

26.    The Company's press releases and SEC filings were group-published documents, representing the collective actions of the Company management.  The Insider Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

**Underwriter Defendants**

27.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") operates as an investment bank in the United States. Its businesses include securities underwriting, sales, and trading, investment banking, private equity, alternative assets, financial advisory services, investment research, and asset management.  It is located at 11 Madison Avenue New York, NY 10010.  Credit Suisse served as a lead underwriter for Rocket Fuel's September 20, 2013 IPO and is liable under the Securities Act in connection therewith.  Plaintiff does not allege any fraudulent conduct by Credit Suisse.

28.     Defendant Citigroup Global Markets Inc. ("Citigroup") provides investment banking and financial advisory services. The firm offers equity and debt financing, asset transaction, private equity, underwriting, institutional sales and trading, and mergers and acquisitions advisory services.  Citigroup is located at 390-388 Greenwich Street New York, NY 10013-2396.  Citigroup served as a lead underwriter of Rocket Fuel's September 20, 2013 IPO and is liable under the Securities Act in connection therewith.  Plaintiff does not allege any fraudulent conduct by Citigroup.

29.     The underwriters were given a 30-day option to purchase up to 600,000 additional shares of common stock at the initial public offering price from certain existing stockholders of Rocket Fuel to cover over-allotments.  Credit Suisse and Citigroup acted as joint book-runners for the offering. Needham & Company, Oppenheimer & Co., Piper Jaffray, BMO Capital Markets, and LUMA Securities acted as co-managers.

30.     The defendants listed in ¶¶27-28, *supra* are hereafter defined as the "Underwriter Defendants."

31.     Rocket Fuel and the Underwriter Defendants offered, solicited, promoted, and/or sold Rocket Fuel's common stock to Plaintiff by the use of means or instrumentalities of interstate commerce by means of defective IPO Offering Materials for their own financial gain. By means of the defective IPO Offering Materials created and disseminated by Rocket Fuel and the Underwriter Defendants in connection with Rocket Fuel's IPO, Rocket Fuel and the

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

Underwriter Defendants assisted in the offering of shares of Rocket Fuel stock to Plaintiff and other members of the Class.

**JURISDICTION AND VENUE**

32.     The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act, (15 U.S.C. §77k) and §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b), §78t(a) and §78t-1) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act, and Section 27 of the Exchange Act.

33.     Venue is proper in this District pursuant to Section 22 of the Securities Act and Section 27 of the Exchange Act.  Many of the false and misleading statements were made in or issued from this District, and Rocket Fuel's principal executive offices are located in this District.

34.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, the Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of national securities exchanges.

**CLASS ACTION ALLEGATIONS**

35.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Rocket Fuel's publicly traded securities during the Class Period.

36.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Rocket Fuel has over 35 million shares of stock outstanding, owned by hundreds if not thousands of persons.

37.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include: (a) whether

defendants violated the federal securities laws; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (d) whether defendants knew or deliberately or recklessly disregarded that their statements were false and misleading; (e) whether the prices of Rocket Fuel publicly traded securities were artificially inflated; and (f) the extent of damage sustained by Class members and the appropriate measure of damages.

38.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the Exchange Act Defendants' wrongful conduct.

39.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

40.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## **BACKGROUND**

41.     Digital advertising fraud is a serious, widespread problem.  In March 2012, an internet security company reported that 51% of online traffic was non-human bot traffic.  An October 2013 report by *AdWeek* entitled "The Amount of Questionable Online Traffic Will Blow Your Mind" reported that "the online ad industry is facing a swelling crisis, one defined by fake traffic, bogus publishers and invisible Web visitors . . . ."  According to estimates by the IAB, about 36% of all Web traffic is considered fake, the product of computers hijacked by viruses and programmed to visit sites.

42.     Fake traffic from bots generate false page view impressions which generate advertising dollars for website owners.  The scheme works because advertisers only pay for their ads to appear on a site, and not specifically to be seen by real people.  In turn, the legitimate ad industry is itself dependent on bot-like technology.   Most such ads are bought "programmatically," or *via* software, like Rocket Fuel's, that automatically places ads in bulk at

tremendous speeds on sites that fit a media campaign. In essence, "robots" are buying ads generated by other "robots" visiting sites, and the buying bots are unable to distinguish the phony bots from legitimate human traffic.

43. As evidence of its purported ability to detect and eliminate purchases of bad inventory for its customers, Rocket Fuel claims to regularly discard up to 40% of all inventory. However, in order to achieve its revenue and growth guidance, Rocket Fuel must screen approximately 500 billion ad impressions each month. As investors ultimately learned, Rocket Fuel cannot achieve effective filtering rates at that volume, but remains dependent on such volume to generate the type of revenue growth it has promised its shareholders.

44. Internet-security experts have stated that tens of thousands of phony websites exist on the internet fueled by "botnets," or zombie armies of hijacked personal computers that are controlled from unknown locations around the world. Simply, the sites take advantage of the fact that advertisers pay to be seen, which creates an incentive for, according to a *Wall Street Journal* report, "fraudsters to erect sites with phony traffic, collecting payments—often through middlemen and sometimes directly from advertisers . . . ."

45. Ultimately, if the fraudulent traffic goes undetected, advertisers end up paying a material portion of their campaign dollars to fraudsters who deliver specious ad impressions that were not viewed by humans. In April 2014, a representative of Kellogg Co. described the problem as follows: "[i]f we are paying any [cost-per-thousand rate] for an impression, it should be an impression. Imagine you buy a dozen donuts, and you open the box and there's one donut. *I want to understand what I am getting for the money*." Specific examples of monetizing fraud include: (i) false impressions – programs imitate legitimate users by repeatedly loading a page or ad for the purpose of generating higher fees in CPM advertising. Advertisers paying for media on a CPM basis are paying for this fraudulent inventory;[4] (ii) false clicks – programmatic clicking and unusual click activity, which is both deceptive, as it skews actual results, and detrimental to

---

[4]      "CPM" means "cost per impression" or "cost per *mille*".

the bottom line in ads purchased on a CPC basis;[5] and (iii) false attribution – stealing credit for sales within a CPA or CPV campaign, despite the fact that the ad impressions were not real and/or not in view.[6]   The theft causes dollars to be funneled away from legitimate channels towards fraudulent ones that have placed the most/latest cookies before a consumer purchase or conversion.

46.     The following ad fraud techniques discovered by web security experts demonstrate the depth of the sophistication of those engaging in ad fraud:

- Crowdsourcing: Thousands of users are recruited and paid just to view an article, providing page views (and extra cash) to the hacker.  The users are unaware that they are performing fraudulent activities.

- Incentivized Ad Networks: Individuals are given incentives like reward points, gift cards, or Bitcoins to read an article or to view/click on an ad.

- Click Farms: These are organized groups of individuals who are paid to click. They use a combination of mobile devices and SIM cards to perform fraud online and repeatedly change their devices and networks to evade detection.

- Computer Malware: Thousands of PCs infected with malware (also known as bot slaves) work in conjunction with a bot master to perform smart fraud online. The bot master decides which sites the slave accesses and which ads it views and clicks so its actions appear to be random and to come from the computer of a "real person."

- Sophisticated Fraud: This type of bot travels around the web to visit websites, view ads, and click using a fairly sophisticated algorithm.

- Retargeting Fraud: This bot can mimic a human's intentions, such as an interest in a specific brand of car. Ads targeted to a particular niche result in a higher CPM than untargeted ads. These bots deceive advertisers into believing they are receiving valuable, targeted clicks.

- Ad Stacking: This is the practice of placing multiple ads on top of each other in a single ad placement. Even though the "stacked" ads are invisible

---

[5]     "CPC" means "cost per click".

[6]     "CPA" means "cost per action" and "CPV" means "cost per view".

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

to the person visiting the page, they are often reported as viewable to the advertiser, so the fraudster gets paid.

- Toolbars: While browser toolbars have legitimate uses, bad actors distribute branded toolbars as part of software bundles that are often installed without the user's knowledge. They hijack the user's browser, reset the default search engine, and enable a platform for serving ads. The new default search engine will usually mimic a well-known search engine and can be extremely difficult to uninstall.

- Ad Injection: Usually masked as "deal finders" for online shoppers, these programs inject unauthorized ads on legitimate web pages. Like toolbars, this software is usually distributed in software bundles and will install without the user's knowledge.

- Domain Identity Theft: A fraudulent seller hard codes a publisher domain into an ad unit. The ad runs on a different publisher that commands a lower price. The buyer thinks their ad ran on the intended domain and somehow they got a deal. Neither the publisher nor advertiser know that they've been defrauded.

47.     On July 23, 2014, *Digiday* ran a story that specifically featured Rocket Fuel's struggles with ad fraud called "Ad Fraud has a Chicken Little Problem," which revealed that:

> In May [2014], online security company Telemetry examined a sample of 365,000 impressions of a Mercedez Benz campaign **sold by Rocket Fuel and found that 57 percent of them were from bots**. While Telemetry didn't argue that Rocket Fuel intentionally sold fraudulent impressions, it still reflected poorly on Rocket Fuel, which is a public company that has worked with clients like Toshiba and Buick.

48.     In turn, the study by ad fraud detection company Telemetry was covered by the *Financial Times* in a May 26, 2014 (*see* ¶83, *infra*) report that first disclosed how Rocket Fuel's Mercedez-Benz ad campaign had "raise[d] questions about Rocket Fuel's assertions on its website that it 'makes sure the "bad actors" always leave empty-handed.'"

49.     Then, on August 5, 2013, the last day of the Class Period, Rocket Fuel's shares plunged in after-hours trading after the Company issued guidance that was far below analysts' and the Company's own estimates for third quarter and full year of 2014 due to customer concerns about poor inventory quality due to ad fraud. These concerns, however, were not new

and had been negatively impacting the company's revenue growth and operations throughout the Class Period.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING**
**CLASS PERIOD STATEMENTS AND OMMISIONS**

50.     Defendants' Class Period misrepresentations concerning the Company's then financial and business condition, including its forecasted financial and business condition as alleged herein, were each materially false and misleading when made because defendants knew, or were reckless in not knowing, that: (i) a large percentage of the ads Rocket Fuel brokered were being "viewed" by automated fraudulent computer programs, rather than real people, such that the Company's operations and financial performance were in jeopardy; (ii) throughout the Class Period, Rocket Fuel's revenue growth was negatively impacted due to its inability to identify and eliminate bot traffic for its customers; (iii) no later than the beginning of February 2014, when the Company was already about 60% locked-in for the first quarter of 2014, the Company knew that it would miss Wall Street consensus estimates for the quarter due to, among other things, customer concern about inventory quality; and (iv) the Secondary Offering was designed to enable Company insiders to unload their shares at artificially inflated prices.  For all the forgoing reasons, Rocket Fuel's Class Period statements as alleged below were materially false and misleading when made.

51.     Rather than disclose Rocket Fuel's limited ability to detect and eliminate ad fraud when purchasing billions of impressions each day, Rocket Fuel represented that its proprietary technology differentiated it from other ad tech companies that were less likely to identify and eliminate bot traffic.  As evidence of this, on August 9, 2013, the Company even included a glossy chart in its road-show presentations to promote its capacity to address ad fraud:

> [W]e're proud to announce the details on how our Real-Time Brand Safety Shield provides the ***highest levels of brand assurance*** to our clients.
>
> At Rocket Fuel we take a proactive approach, with three layers of defense that block bad sites and pages ***before we ever serve a single ad on them***. By building additional levels of safety and security right into our platform and processes, we

- 14 -
COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

ensure our technology delivers both ROI [return on investment] and **peace of mind for brands**.



52.     On September 18, 2013, the Company filed its Third Amended Registration Statement and Preliminary Prospectus on Form S-1/A with the SEC.  The Registration Statement contained a Prospectus Summary that represented that the "convergence of several trends is generating demand for technology-driven solutions," including:

Real-time advertising exchanges are emerging and growing rapidly, and have **reduced the transactional friction that historically was associated with the buying and selling of digital advertising inventory**.  Real-time bidding, or RTB, is the real-time purchase and sale of advertising inventory on an impression-by-impression basis on advertising exchanges. RTB is expanding faster than any other segment of the digital advertising industry as a result of a number of trends, including the emergence of programmatic buying, which enables the automated purchasing of advertising inventory; the creation of an abundance of digital advertising inventory, which has grown substantially as consumers and content have continued to migrate online; increased use of real-time advertising exchanges by publishers; and recognition by advertisers that using real-time advertising exchanges is an effective way to achieve their campaign goals. **Adding to these trends is the virtuous cycle that has been created as publishers increase inventory supply, enabling better advertising results, which then increases demand for additional advertising inventory, leading to increased incentives for publishers to make additional inventory available through real-time advertising exchanges**.

53.     As evidence that Rocket Fuel understood the importance of fraud detection, the Registration Statement further represented in its purported "risk disclosures" that:

> *If we fail to detect fraud or serve our advertisers' advertisements on undesirable websites, our reputation will suffer, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations.*
>
> Our business depends in part on providing our advertisers with a service that they trust, and we have contractual commitments to take reasonable measures to prevent advertisers' advertisements from appearing on undesirable websites or on certain websites that they identify. We use proprietary technology to detect click fraud and block inventory that we know or suspect to be fraudulent, including 'tool bar' inventory, which is inventory that appears within an application, often called a "tool bar," and that overlays a website and displaces any advertising that would otherwise be displayed on such website. We also use third-party services in an effort to prevent our advertisers' advertisements from appearing on undesirable websites. Preventing and combating fraud requires constant vigilance, and we may not always be successful in our efforts to do so.  We may serve advertising on inventory that is objectionable to our advertisers, and we may lose the trust of our advertisers, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations. We may also purchase inventory inadvertently that proves to be unacceptable for advertising campaigns, in which case we are responsible for the cost and cannot bill that cost to any campaign. If we buy substantial volumes of unusable inventory, this could negatively impact our results of operations.

54.     The statements outlined in ¶¶51-53 were materially false and misleading because: (i) Defendants failed to disclose that the Company's inability to adequately detect and eliminate digital ad fraud, including bot traffic, was negatively impacting Rocket Fuel's operations and financial performance; (ii) Defendants either knew, or were reckless in not knowing, that attempting to traffic 500 billion ad impressions per month made it a virtual certainty that the Company *would* fail to detect ad fraud at levels acceptable to its customers; (iii) a material percentage of the ads Rocket Fuel brokered were being "viewed" by automated fraudulent computer programs, rather than real people.  In addition, Defendants also failed to disclose information about the impact of bot traffic in a manner that would have warned investors that the Company's current and future financial performance was in jeopardy.

55.     On September 20, 2013, the first day of the Class Period, and the debut of trading for Rocket Fuel's common stock, the Company's share price spiked 93% from $29.00 to close at $56.10 as a result of the IPO roadshow and the materially false and misleading statements and omissions alleged in ¶¶51-53.  The same day, the Company filed a Prospectus pursuant to SEC Rule 424(b)(4) that repeated the same materially false and misleading statements and omissions alleged in ¶¶52-53, *supra*.

56.     In addition, in sections of the September 20, 2013 Prospectus called "Challenges Faced by Digital Advertisers" and "Risks Affecting Us," Rocket Fuel failed to disclose the challenges faced or the true risks posed by the impact of digital ad fraud and bot traffic on the Company's operations and financial performance.  Given the Company's assurances that Rocket Fuel could "detect and eliminate" ad fraud and bot traffic, these were material omissions.

57.     In early November 2013, Rocket Fuel further represented that its "powerful Advertising That Learns® technology uses real-time data points to recognize these bad actors and block them at the source" and that the Company "is able to identify and eliminate all threats before serving a single ad."  Hence, to the extent shareholders were aware of the pervasiveness of ad fraud, such statements reassured investors that Rocket Fuel's proprietary technology differentiated it from other companies who could not identify and eliminate such threats. On November 7, 2013, the Company issued a press release that it filed with the SEC on Form 8-K that stated, "Rocket Fuel Reports Record Revenue in Third Quarter 2013."  In it, Defendant John represented that:

> Rocket Fuel continued its strong growth during the third quarter, as revenue grew 132% to $62.5 million. We continued this fast-paced growth while managing EBITDA close to break-even, producing an adjusted EBITDA loss of $(0.7) million. Compared to last year's third quarter, we more than doubled our customer base and more than tripled the percent of revenue coming from new advertising channels that include mobile, social and video, to 26% of our total revenue.

58.     While the Company's share price did not increase as a result of these statements, the artificial inflation in the share price was maintained by Defendants' materially false and

misleading statements and omissions.  The statements made by Defendants and reproduced in

¶57 above were materially false and misleading at that time, and were known by Defendants to

be false, or were deliberately or recklessly disregarded as such at that time for the same reasons

set forth in ¶54, *supra*.

59.     On November 13, 2013, Defendants filed with the SEC the Company's third

quarter of 2-13 Form 10-Q, which was signed by Defendant Bardwick.  The Company's

Quarterly Report reiterated the Company's third quarter and full year of 2013 performance.  In

addition, in the purported "risk disclosures" of the Quarterly Report, the Company represented

that:

> ***If we fail to detect fraud or serve our advertisers' advertisements on undesirable websites, our reputation will suffer, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations.***
>
> Our business depends in part on providing our advertisers with a service that they trust, and we have contractual commitments to take reasonable measures to prevent advertisers' advertisements from appearing on undesirable websites or on certain websites that they identify. We use proprietary technology to detect click fraud and block inventory that we know or suspect to be fraudulent, including 'tool bar' inventory, which is inventory that appears within an application, often called a "tool bar," and that overlays a website and displaces any advertising that would otherwise be displayed on such website. We also use third-party services in an effort to prevent our advertisers' advertisements from appearing on undesirable websites. Preventing and combating fraud requires constant vigilance, and we may not always be successful in our efforts to do so.  We may serve advertising on inventory that is objectionable to our advertisers, and we may lose the trust of our advertisers, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations. We may also purchase inventory inadvertently that proves to be unacceptable for advertising campaigns, in which case we are responsible for the cost and cannot bill that cost to any campaign. If we buy substantial volumes of unusable inventory, this could negatively impact our results of operations.

60.     In connection with that same SEC filing, Defendants John and Bardwick each

certified the Company's internal controls under §§302 and 906 of the Sarbanes-Oxley Act of

2002 and represented *inter alia* that:

1)      I have reviewed this Quarterly Report on Form 10-Q of Rocket Fuel Inc.;

- 18 -
COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

2) Based on my knowledge, this report **_does not contain any untrue statement of a material fact or omit to state a material fact_** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3) Based on my knowledge, the financial statements, and other financial information included in this report, **_fairly present_** in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

61.   In response to these announcements, the Company's stock price rose from $51.01 on November 13, 2014 to close at $54.89 the following day, November 14, 2014.

62.   The statements made by Defendants and reproduced in ¶¶59-60 above were materially false and misleading at that time, and were known by Defendants to be false, or were deliberately or recklessly disregarded as such at that time for the same reasons set forth in ¶54, *supra*. In addition, the third quarter of 2013 Quarterly Report provided the same misleading purported "risk disclosure" alleged in ¶53, *supra*.

63.   On January 22, 2014, Rocket Fuel released a press release that was later filed with the SEC on Form 8-K on January 23, 2014 announcing its "Preliminary Fourth Quarter 2013 Financial Results and Initial 2014 Guidance." In it, Rocket Fuel provided initial guidance for the first quarter and the fiscal year of 2014 as follows:

**For the first quarter of 2014**:

• Revenue in the range of $73 million to $76 million.

• Adjusted EBITDA in the range of ($9.0) million to ($7.5) million.

**For fiscal 2014**:

• Revenue in the range of ***$420 million to $435 million***.

• Adjusted EBITDA in the range of $3 million to $6 million.

64.   Shares of the Company's common stock continued to trade at levels artificially inflated by Defendants' unreasonably aggressive guidance and, but for that guidance, the Company's share price would have fallen even further than it did on January 23, 2014. Unbeknownst to investors, Defendants' aggressive fiscal 2014 revenue guidance was also designed to inflate and maintain Rocket Fuel's high stock price in order to enable insiders to sell

over $175 million of privately held shares in the Secondary Offering that was unexpectedly announced in a same-day press release on Form 8-K.

65.     Rocket Fuel thereafter filed a Registration Statement on Form S-1 with the SEC relating to its proposed Secondary Offering *via* a Prospectus that was filed with the SEC pursuant to Rule 424(b)(4) on January 31, 2014.  After deducting underwriters' discounts and commissions and offering expenses, the aggregate net proceeds received by the Company totaled approximately $115.4 million.

66.     The January 31, 2014 Prospectus contained the same misleading "risk disclosure" alleged in ¶53, *supra*, and, in sections of the Prospectus called "Challenges Faced by Digital Advertisers" and "Risks Affecting Us," Rocket Fuel failed to disclose the challenges faced or the true risks posed by the impact of digital ad fraud and bot traffic on the Company's operations and financial performance.

67.     Following the Secondary Offering, Rocket Fuel's trajectory almost immediately headed south.  In an April 25, 2014 article called "Rocket Fuel Stock Hits All-Time Low in Wake of Insider Trades," online publication *AdExchanger* highlighted how:

> Rocket Fuel's stock closed at $31.04 Friday, near its lowest point since the ad tech company went public six months ago. The sell-off comes after a group of more than seven investors and senior executives cashed out to the tune of ***more than $150 million***, as reported by *InsiderTradingWire*. Those transactions, which earned more than $14 million each for the company's top two executives, CEO George John and President Richard Frankel, took place between February 3 and February 7.

*     *     *

> Wall Street can get jittery when insiders sell large stock volumes, although in Rocket Fuel's particular case it's not clear whether the stock's latest tumble is due to more insiders dumping smaller volumes of equity or (worse for Rocket Fuel) external investor fears that the insider trades signal ***a lack of faith from senior management***.

68.     A few days after the Secondary Offering, Vivek Shah, the then-new Chair of the IAB, stated in early February 2014 that online traffic fraud had "reached ***crisis proportions***" and that ad fraud has "been a ***dirty secret*** we've [been] willing to keep."  A report appearing on *AdWeek* on February 9, 2014 captured his comments, in part, as follows:

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

Vivek Shah was named the new chairman of the Interactive Advertising Bureau tonight. And he started his tenure by immediately taking the industry to task for letting bad traffic perpetuate—taking particular aim at digital media buyers.

During a blunt keynote address at the IAB Annual Meeting, Shah said of the online ad business: 'It seems to me that we have taken a perfect product and by our own actions have made it imperfect. Let's start with traffic fraud. We have reached crisis proportions.'

Not mincing words, prior to his speech Shah said that the online ad world has been too quick to blame rogue bot operators and shady publishers for all the bogus traffic flowing on the Web. *He called out ad buyers in particular*.

'We need to stop the devaluing of digital media,' he told *Adweek*. '*The buyers are willing to be defrauded because it looks good on paper*.'

\* \* \*

'It's been a *dirty secret* we've [been] willing to keep. Bogus impressions won't infect the system if you don't buy them  ... You don't go after drug dealers. You go after people taking the drugs.'

69.     On February 20, 2014, Rocket Fuel reiterated its first quarter and full year of 2014 outlook as follows:

**First Quarter 2014**

- Revenue in the range of $73.0 million to $76.0 million

- Adjusted EBITDA in the range of $(9.0) million to $(7.5) million

**Fiscal Year 2014**

- *Revenue in the range of $420.0 million to $435.0 million*

- Adjusted EBITDA in the range of $3.0 million to $6.0 million

70.     In the same press release, Defendant Bardwick represented that

[o]ur robust revenue growth and continued focus on operational efficiency puts us on a strong trajectory for 2014. We have significantly strengthened our balance sheet which increases our ability to gain advantages within a fragmented, *rapidly growing market*. We believe that continued investment in talent, technology and infrastructure will enable us to continue to increase market share while expanding our total available market opportunities through new channels, products and geographies.

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

In response to this announcement, the Company's share price increased from $52.77 to close at $53.96 the following day, February 21, 2014.

71.     The statements referenced in ¶69-70 above were materially false and misleading when made because Defendants knew but failed to disclose that: (i) no later than the beginning of February 2014, where the Company was already 60% locked-in for the first quarter of 2014, the Company's financial condition and future prospects were far more limited than represented to investors and that it would miss Wall Street consensus estimates; (ii) a large percentage of the ads Rocket Fuel brokered were "viewed" by automated computer programs rather than real people such that the Company's financial performance was in jeopardy; and (iii) the Secondary Offering was designed to enable Company insiders to unload their shares at artificially inflated prices.  For all the forgoing reasons, Rocket Fuel's Class Period financial statements were all materially false and misleading when made.  In addition, Defendants also failed to disclose information about bot traffic in a manner that would have warned investors that the Company's current and future financial performance was in jeopardy.

72.     On February 28, 2014, Rocket Fuel filed its Annual Report for 2013 on Form 10-K with the SEC.  The Company's 2013 Annual Report provided the same materially misleading "risk disclosure" alleged in ¶53, *supra*.  In addition, in the section of the Annual Report called "Challenges Faced by Digital Advertisers," Rocket Fuel failed to disclose the risks posed by digital ad fraud and bot traffic.

73.     In connection with that filing, Defendants John and Bardwick certified the Company's internal controls under §§302 and 906 of the Sarbanes-Oxley Act of 2002 and made the same representations described in ¶60, *supra,* including that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Rocket Fuel Inc. for the periods presented therein" and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

74. The statements made by Defendants and reproduced in ¶¶72-73 above were materially false and misleading at that time, and were known by defendants to be false, or were deliberately or recklessly disregarded as such at that time for the same reasons set forth in ¶50, *supra*.

75. On May 8, 2014, Rocket Fuel announced its financial results for the first quarter ended March 31, 2014. The Company reported a first quarter loss of $0.18 per share, which was a higher loss than Wall Street consensus estimates, and reported revenue of $74.4 million, which was lower than consensus estimates. The Company also provided a lower-than-expected revenue outlook for the second quarter of 2014 (forecast revenue of $88 - $92 million versus consensus of $101.8 million), but ***confirmed guidance for fiscal year of 2014 of $420-$435 million***. Importantly, the improvement in the Company's loss per share compared to prior year second quarter was attributable to the Secondary Offering, which resulted in the number of shares increasing from 8,298 in the year-ago quarter to 34,033 shares in the reported quarter, and thus not a sign of financial health.

76. In connection with the filing, Defendant Bardwick stated "[w]e are reiterating our 2014 guidance as we expect revenue growth in the latter half of the year to increase slightly from our expected Q2 growth rate due to a number of factors, including the impact of recent sales hiring and expanded offerings that enhance our current product suite." Similarly, Defendant John represented that:

> Rocket Fuel continued its strong revenue growth in the first quarter of 2014, reporting an increase of 95% from the first quarter of 2013, and posted its ninth consecutive quarter of more than 100% growth in revenue less media costs and gross profit. ***Strong increases in the number of active customers***, gross margin and other channels revenue, specifically revenue from mobile delivery which grew to 26% of our total, were other notable highlights of our progress during the first quarter compared to the first quarter in the prior year. ***Rocket Fuel continues to outpace the growth of the digital advertising market by leveraging our artificial intelligence-driven solutions across a growing base of diverse advertisers***.

77. Shares of the Company's common stock continued to trade at levels artificially inflated by the statements described in ¶¶75-76, *supra*. While the Company's share price did not

increase, the artificial inflation in the Company's common stock continued to be maintained by Defendants' prior materially false and misleading statements and omissions. Moreover, although the Company reiterated its 2014 guidance that *summer* with its May 8, 2104 announcement as alleged in ¶75, on August 5, 2014, Defendant John later acknowledged that "industry buzz *this summer* around bot traffic and low-quality ad space on digital exchanges [ ] has led some agency media buyers to begin questioning exchange-based buying generally."

78.    The statements made by Defendants and reproduced in ¶¶75-76 above, including the representation that the Company had seen "strong increases in the number of active customers," were materially false and misleading at that time, and were known by Defendants to be false, or were deliberately or recklessly disregarded as such at that time for the same reasons set forth in ¶¶50, 54, *supra*.

79.    On May 9, 2014, the Company's shares fell 30% from $31.00 to $26.85 as investors started to question whether Rocket Fuel could deliver on its promise to detect and eliminate ad fraud. Despite the drop in the price of the Company's common stock, the fact that the Company had reiterated its aggressive 2014 full year guidance maintained the artificial inflation in the Company's stock price. Following the Company's disappointing earnings, Goldman Sachs downgraded Rocket Fuel to "neutral" from "buy" and cut its price target to $25 from $69, citing a reduction in average customer spending.

80.    On May 15, 2014, Defendants filed the Company's Quarterly Report for the first quarter of 2014 on Form 10-Q with the SEC, which was signed by Defendant Bardwick and which included the same materially misleading "risk disclosure" statements alleged in ¶53, *supra*.

81.    In connection with Rocket Fuel's Quarterly Report, Defendants John and Bardwick certified the Company's internal controls under §§302 and 906 of the Sarbanes-Oxley Act of 2002 and made the same representations described in ¶60, *supra*, including that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Rocket Fuel Inc. for the periods presented therein" and that

- 25 -

"this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

82.    The statements made by Defendants and reproduced in ¶¶80-81 above were materially false and misleading at that time, and were known by Defendants to be false, or were deliberately or recklessly disregarded as such at that time for the same reasons set forth in ¶¶50, 54 *supra*.

83.    On May 26, 2014, the *Financial Times* ran a story on Rocket Fuel reporting that:

Part of a recent Mercedes-Benz online advertising campaign was viewed more often by automated computer programmes than by human beings, according to documents seen by the Financial Times.

The ads were inadvertently placed on to fraudulent websites by Rocket Fuel, a Nasdaq-listed ad technology company that went public last September with a market capitalisation of nearly $1bn.

***The incident will intensify concerns about the prevalence of fraud in the fast-growing online advertising market***, which expanded 15 per cent last year to $120bn.

In Mercedes-Benz's case, the suspicious traffic was discovered in an investigation for the German carmaker by Telemetry, a UK company that specialises in detecting ad fraud.

In a sample of 365,000 ad impressions brokered by Rocket Fuel over three weeks, Telemetry found that ***57 per cent were "viewed" by automated computer programs rather than real people***.

Mercedes said that over the whole of its campaign, the proportion of questionable impressions was less than 6 per cent, and that ***Rocket Fuel 'refunded us for the suspect impressions'***. The carmaker added that it and its US advertising agency, Merkley & Partners, which is part of Omnicom Group, have continued to work with Rocket Fuel.

There is no suggestion that Rocket Fuel, which acts as an intermediary between advertisers and online publishers, was aware that it was delivering its client's ads to fraudsters. The company buys ad inventory via ad exchanges, which are in turn plugged in to thousands of publishers.

***However the findings raise questions about Rocket Fuel's assertions on its website that it 'makes sure the 'bad actors' always leave empty-handed'.***[7]

Rocket Fuel played down Telemetry's report, saying it was not sure that the figures were '100 per cent correct'. It said the findings came from a small sample and did not represent the type of traffic that normally passes through its systems.

To identify and block suspicious activity, Rocket Fuel uses a combination of its own technology and partnerships with third parties such as Double Verify and Integral Ad Science.

Rocket Fuel said that in February, it identified and rejected 500bn bid requests from online publishers because of inventory quality concerns.

Fraudsters are coming up with increasingly sophisticated ways to deceive online advertisers, using software that mimics the behaviour of a real person browsing the web.

Telemetry detected the bots by identifying anomalies in traffic to the ads. Virtually all of the suspect traffic came from five small internet service providers. And the computers "viewing" the ads used Linux, an operating system rarely used on desktops, though they attempted to disguise this by simulating popular web browsers that only work on Windows or Macs.

Telemetry said it had traced the ownership of the bot network to two people in the UK, who directed the bots to websites they owned, thereby making money from the ad sales. The websites have since disappeared.

84.     In response, on May 27, 2014, Rocket Fuel criticized the *Financial Times* for what it described as sensational headlines masquerading as fact.  Specifically, in Rocket Fuel's online "Response to the *Financial Times*," Rocket Fuel noted that "[b]ots are a real problem" but less so than "***sensational headlines*** on top of non-news," and that the Company was able to "make good" the volumes of the fraudulent impressions that were detected by repaying Mercedes.  In response to Rocket Fuel's defense, Telemetry strongly suggested that Rocket Fuel had been unable to even identify – let alone eliminate – ad fraud in its media campaigns:[8]

If an ad tech platform such as Rocket Fuel were unable to detect the fraudulent impressions before we identified them ***then what does that mean for campaigns that sit outside the sample that Telemetry analyzed***?

*        *        *

---

[7]     *See* http://rocketfuel.com/blog/rocket-fuel-brand-safety-series-suspicious-activity (last visited Aug. 10, 2014).

[8]     *See* http://www.telemetry.com/responses.html (last visited Aug. 14, 2014).

For clarity, there is no suggestion that Rocket Fuel sold fraudulent impressions willingly or knowingly **but what our investigations continue to highlight is the extent to which ad tech platforms themselves claim to be 'brand safe' and immune to the articulate and unrelenting vehicles and instruments of online advertising fraud.** To what extent are they actually able to detect and therefore protect against this and how they can best help advertisers.

85.     Then, on June 17, 2014, the SEC sought additional information from Rocket Fuel regarding the consequences for delivering advertising spots or impressions that did not satisfy the campaign parameters specified by its customers.  On July 1, 2014, Rocket Fuel responded that:

> [T]he Company will have failed to deliver according to the terms of the IO [insertion order]. The form IO includes remedies for failure to deliver according to the specifications of the IO. However, those remedies are not defined as exclusive remedies in the standard terms and conditions, so if the Company was in breach of the IO terms and conditions, the advertiser could seek additional remedies. For example, the advertiser may refuse to pay the contractually stated price in the IO for the delivered impressions. ***The Company may also lose the business of that advertiser.***

## THE CLASS PERIOD ENDS

86.     On August 5, 2014, after the close of trading, Rocket Fuel announced that it expected 2014 revenue of $403 million to $427 million, down sharply from its recently-reiterated forecast of $420 million to $435 million, as alleged in ¶¶63, 69, and 75, *supra*.  The same day, the *Wall Street Journal* reported that "Rocket Fuel Inc. lowered its full-year revenue guidance for the year, pointing to **customer concerns about inventory quality** . . . ." During a same-day conference call with investors, Defendant John suggested that concerns about fraudulent traffic is "a phenomena in our industry that hasn't been well understood," and tried to claim that the Company was "**surprised** by the strength of trends impacting our bookings in June [2014], and we now feel our full-year guidance should take into account slightly lower sales productivity based on the following three factors."  One of those trends was "bot traffic and low-quality ad space on digital exchanges."

87.     The following day, on August 6, 2014, the Company's shares fell from $24.75 to $17.05 – a decline of approximately 30%.  Analysts were skeptical that Defendants had been

caught by surprise by the impact of bot traffic on the Company's operations and financial performance and outlook.  Credit Suisse analyst Stephen Ju, for instance, asked "in regards to the industry concern around bot traffic, because it seems like the lack of ROI [return on investment] from bot-driven traffic *should already be well reflected in the price*.  So can you add some additional color on the advertising concerns here?"  In response, a $20 million-wealthier Defendant John effectively conceded the analyst's skepticism even as he tried to misleadingly characterize the ad tech industry's longstanding bot traffic issue as a "new thing":

> [F]rom the customer perspectives, it's I think a phenomena in our industry that hasn't been well understood I think by a lot of advertisers. I think agencies have understood, but maybe hadn't really filtered all the way down to advertisers yet. So it's going through a brief period of time here where it's the *new thing* to be confused about and try to understand. *But you're right*, ultimately, that it's only a piece of a puzzle and if you're still able to generate better ROI [return on investment], *you would think you would only do that if you weren't (technical difficulty) robots since they don't buy things.*

88.   On August 15, 2014, Rocket Fuel issued a press release contradicting its own CEO representing that "[a]dvertising fraud is *not a new problem*."[9]

89.   As alleged herein, while publicly touting Rocket Fuel's prospects and performance before and during the Class Period, internally, Defendants knew or were reckless in not knowing that the Company's current and future financial performance was in jeopardy. Rather than disclose the depth and pervasiveness of Rocket Fuel's bot traffic challenges to its shareholders, Defendants provided bullish full year 2014 guidance in the fourth quarter of 2013 and the first quarter of 2014, only to drastically revise that guidance a short time later in the second quarter of 2014.

90.   After the Class Period, Rocket Fuel filed its Quarterly Report with the SEC on Form 10-Q on August 14, 2014.  Therein, and for the first time ever in its purported "risk disclosures," the Company finally warned investors about what it had known from the first day

---

[9]   *See*   http://www.marketwatch.com/story/media-alert-rocket-fuel-expert-shares-best-practices-to-combat-digital-advertising-fraud-with-the-bbc-2014-08-15   (last visited Sept. 2, 2014).

of the Class Period – namely that if it served advertisers' advertisements on undesirable websites or failed to detect fraud ***"including bot traffic,"*** the Company's reputation and business operations would suffer.  And, finally underscoring the severity of the ad fraud issue, on August 15, 2014, Rocket Fuel issued a press release titled "Media Alert: Rocket Fuel Expert Shares Best Practices to Combat Digital Advertising Fraud With the BBC," in which it finally warned investors that: "[a]ccording to the Interactive Advertising Bureau, advertising fraud could cost advertisers $11 billion dollars alone this year and 25-50% of digital spend could be wasted on ads that are never viewed by humans."  Too little, too late for shareholders who suffered significant damages as a result of defendants materially false and misleading representations and omissions.

## LOSS CAUSATION

91.     The economic loss, *i.e.*, damages suffered by Plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Rocket Fuel's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misstatements and other fraudulent conduct was revealed.

92.     At all relevant times, the material misrepresentations and omissions alleged in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, the Insider Defendants made or caused to be made a series of materially false or misleading statements about Rocket Fuel's business, prospects, and operations.

93.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Rocket Fuel and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period caused Plaintiff and other members of the Class to purchase the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**INAPPLICABILITY OF SAFE HARBOR**

94.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as and were not "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

95.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Insider Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Rocket Fuel who knew that those statements were false when made.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET AND MATERIAL OMISSIONS**

96.     At all relevant times, the market for Rocket Fuel's common stock was an efficient market for the following reasons, among others:

(a) Rocket Fuel's common stock met the requirements for listing on, and was listed and actively traded on, the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Rocket Fuel filed periodic reports with the SEC and the NASDAQ;

(c) Rocket Fuel regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Rocket Fuel was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

97.    As a result of the foregoing, the market for Rocket Fuel's securities promptly digested current information regarding Rocket Fuel from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Rocket Fuel's securities during the Class Period suffered similar injury through their purchase of Rocket Fuel's securities at artificially inflated prices, and the *Basic* and *Affiliated Use* presumptions of reliance apply.

## COUNT I
### For Violations of § 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against Rocket Fuel and the Insider Defendants)

98.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein

99.    During the Class Period, Rocket Fuel and the Insider Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew were or deliberately disregarded as being misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

100.    Rocket Fuel and the Insider Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.    Rocket Fuel and the Insider Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations, and future prospects of Rocket Fuel as specified herein.  Rocket Fuel and the Insider Defendants had actual knowledge of the

misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants' engaged in misconduct knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Rocket Fuel's true financial condition from the investing public and supporting the artificially inflated price of Rocket Fuel's securities.

102.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rocket Fuel's publicly traded securities. Plaintiff and the Class would not have purchased Rocket Fuel's publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for Rocket Fuel's securities had been artificially inflated by Rocket Fuel and the Insider Defendants' materially false and misleading statements.

## COUNT II
### For Violations Of § 20(a) Of The Exchange Act
### (Against The Insider Defendants)

103.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.   During the Class Period, the Insider Defendants acted as controlling persons of Rocket Fuel within the meaning of § 20(a) of the Exchange Act.  By reason of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, the Insider Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the materially false and misleading statements alleged herein.

105.   By reason of such conduct, the Insider Defendants are liable pursuant to § 20(a) of the Exchange Act.

## COUNT III
### Violation of §11 of the Securities Act
### (Against All Defendants)

COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS

106.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent.  For purposes of this Count, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability or negligence under the Securities Act.  This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class.

107.    The IPO Offering Materials contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading.  The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Offering Materials.  Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the Offerings pursuant to the IPO Offering Materials that contained untrue statements and omissions of material fact.

108.    Rocket Fuel is the registrant and, as such, is strictly liable to Plaintiff and the Class for untrue statements and omissions contained in the IPO Offering Materials.

109.    Each of the individual defendants named in this Count is liable as they each signed or authorized the signing of one or both of the IPO Offering Materials.  By virtue of signing one or more of the IPO Offering Materials, they issued, caused to be issued and participated in the issuance of the IPO Offering Materials which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.  These defendants failed to conduct a reasonable investigation of the statements in one or more of the IPO Offering Materials and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misstated.

110.    None of the Defendants named herein possessed reasonable grounds for the belief that the statements and omissions contained in the IPO Offering Materials were true and without omissions of any material facts.

111.    By reason of the conduct herein alleged, the Defendants named herein violated or controlled a person who violated Section 11 of the Securities Act.

112.    Plaintiff purchased or otherwise acquired Rocket Fuel stock pursuant to or traceable to the IPO Offering Materials and was damaged thereby.

113.    Plaintiff and the Class have sustained damages.  Plaintiff and the other members of the Class likewise did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the IPO Offering Materials when they purchased or acquired shares of Rocket Fuel's common stock.

114.    Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed.  Less than three years elapsed since the stock upon which this Count is brought was *bona fide* offered to Plaintiff and the Class.

<u>COUNT IV</u>
**Violations of Section 12(a)(2) of the Securities Act**
**(Against Rocket Fuel and the Underwriter Defendants)**

115.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent.  For purposes of this Count, Plaintiff expressly excludes and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

116.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, by Plaintiff and other members of the Class who purchased or otherwise acquired common stock in the IPO against Rocket Fuel and the Underwriter Defendants.  The IPO Offering Materials contained untrue statements of material fact and omitted to disclose material facts, as detailed above.  The facts misstated and omitted would have been material to a reasonable person reviewing the IPO Offering Materials.

117.    Rocket Fuel and the Underwriter Defendants owed Plaintiff and the other members of the Class who acquired Rocket Fuel stock pursuant to the IPO Offering Materials

the duty to make a reasonable and diligent investigation of the statements contained in the IPO Offering Materials to ensure that such statements were true and that there were no omissions to state a material fact required to be stated in order to make the statements contained therein not misleading.

118.    Rocket Fuel and the Underwriter Defendants did not make a reasonable and diligent investigation of the statements contained in the IPO Offering Materials and did not possess reasonable grounds for believing that the IPO Offering Materials did not contain an untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  Rocket Fuel and the Underwriter Defendants, in the exercise of reasonable care, should have known of the untrue statements and omissions contained in the IPO Offering Materials as set forth above and/or should have updated investors regarding material information about the IPO.

119.    Plaintiff purchased or otherwise acquired Rocket Fuel securities pursuant to the defective IPO Offering Materials.  Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the IPO Offering Materials at the times Plaintiff acquired Rocket Fuel stock during the Class Period.  As a direct and proximate result of such violations, Plaintiff and the other Class members sustained substantial damages.

120.    Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed.  Less than three years elapsed since the stock upon which this Count is brought was *bona fide* offered to Plaintiff and the Class.

### COUNT V
### Violations of Section 15 of the Securities Act
### (Against the Insider Defendants)

121.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein except for the allegations of fraudulent intent.  For the purposes of this Count, Plaintiff expressly exclude and disclaim any allegation that could be construed as alleging

fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.  This Count is brought pursuant to Section 15 of the Securities Act against the Insider Defendants.

122.    At all relevant times, the Insider Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Each of these defendants served as an executive officer of Rocket Fuel prior to and at the time of the offerings.  At all relevant times, these defendants had the power, influence and control over the operation and management of the Company and the conduct alleged herein.  Each conducted and participated, directly and indirectly, in the conduct of Rocket Fuel's business affairs.  As officers of a publicly owned company, these defendants had a duty to disseminate accurate and truthful information with respect to Rocket Fuel's financial condition and results of operations.

123.    By reason of the aforementioned conduct, each of the defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Section 11 of the Securities Act, to Plaintiff and the other members of the Class who purchased securities in the Offerings or traceable to the offerings.  As a direct and proximate result of the conduct of these defendants, Plaintiff and other members of the Class suffered damages in connection with their purchase or acquisition of Rocket Fuel common stock.

124.    Less than one year has elapsed from the time Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time the action was filed.  Less than three years elapsed since the stock upon which this Count is brought was bona fide offered to Plaintiff and the Class.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.     Awarding Plaintiff and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.     Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury in this action for all issues so triable.

Dated: September 3, 2014                KAHN SWICK & FOTI, LLP

By:    *s/ Ramzi Abadou*
Ramzi Abadou (SBN 222567)
ramzi.abadou@ksfcounsel.com
KAHN SWICK & FOTI, LLP
505 Montgomery Street, 10th Floor
San Francisco CA 94111
Telephone: (415) 874-3047
Facsimile: (504) 455-1498

Lewis S. Kahn (to seek *pro hac vice* admission)
lewis.kahn@ksfcounsel.com
Melinda A. Nicholson (to seek *pro hac vice* admission)
melinda.nicholson@ksfcounsel.com
Michael J. Palestina (to seek *pro hac vice* admission)
michael.palestina@ksfcounsel.com
KAHN SWICK & FOTI, LLC
206 Covington St.
Madisonville, LA 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

*Counsel for Plaintiff Nipu Shah*